Slip Op. 18-156

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ABB INC., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Mark A. Barnett, Judge |
| Defendant, | Consol. Court No. 16-00054 |
| and | **PUBLIC VERSION** |
| HYUNDAI HEAVY INDUSTRIES CO., LTD., HYUNDAI CORPORATION USA, AND HYOSUNG CORPORATION, | |
| Defendant-Intervenors. | |

### <u>OPINION AND ORDER</u>

[Sustaining, in part, and remanding, in part, the U.S. Department of Commerce's Remand Redetermination in the second administrative review of the antidumping duty order on large power transformers from the Republic of Korea.]

Dated: November 13, 2018

<u>R. Alan Luberda</u> and <u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Plaintiff.  With them on the brief was <u>David C. Smith, Jr.</u>

<u>John J. Todor</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director.  Of Counsel on the brief was <u>Christopher Hyner</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>J. David Park</u>, Arnold & Porter Kaye Scholer LLP, of Washington, DC, argued for Consolidated Plaintiff and Defendant-Intervenor Hyosung Corporation.  With him on the brief were <u>Andrew M. Treaster</u>, <u>Henry D. Almond</u>, <u>Daniel R. Wilson</u>, and <u>Sylvia Y. Chen</u>.

<u>David E. Bond</u>, White & Case LLP, of Washington, DC, argued for Defendant-Intervenors Hyundai Heavy Industries, Co., Ltd.[1] and Hyundai Corporation USA.  With him on the brief were <u>William J. Moran</u> and <u>Ron Kendler</u>.

Barnett, Judge: This matter comes before the court following the U.S. Department of Commerce's ("Commerce" or the "agency") redetermination upon remand.  *See* Confidential Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 96.[2]  ABB Inc. ("ABB") and Hyosung Corporation ("Hyosung") initiated this action, challenging certain aspects of Commerce's final results in the second administrative review ("AR 2") of the antidumping duty order on large power transformers ("LPT") from the Republic of Korea for the period of review August 1, 2013, through July 31, 2014.  *See Large Power Transformers from the Republic of Korea*, 81 Fed. Reg. 14,087 (Dep't Commerce March 16, 2016) (final results of antidumping duty admin. review; 2013–2014) ("*Final Results*"), and accompanying Issues and Decision Mem., A–580–867 (Mar. 8, 2016) ("I&D Mem."), ECF No. 27-2; *see also* Consent Mot. to Consolidate, ECF No. 33; Order (Jun. 14, 2016), ECF No. 36.

---

[1] Hyundai Electric & Energy Systems Co., Ltd. is the successor-in-interest to Hyundai Heavy Industries, Co., Ltd.  *See* Letter from David E. Bond, Attorney, White & Case LLP, to the Court (Sept. 12, 2018), ECF No. 120.

[2] The administrative record for this case is divided into a Public Administrative Record ("PR"), ECF No. 27-3, and a Confidential Administrative Record ("CR"), ECF No. 27-4. Parties submitted joint appendices containing record documents cited in their U.S. Court of International Trade Rule 56.2 briefs.  *See* Confidential J.A. ("CJA"), ECF No. 73; Public J.A. ("PJA"), ECF No. 74.  The administrative record associated with the Remand Results is contained in a Confidential Remand Administrative Record ("CRR"), ECF No. 100-2, and a Public Remand Administrative Record ("PRR"), ECF No. 100-3.  Parties further submitted joint appendices containing record documents cited in their Remand briefs. *See* Confidential Remand Proceeding J.A. ("CRJA"), ECF No. 113; Public Remand Proceeding J.A. ("PRJA"), ECF No. 114.  Citations are to the confidential joint appendices unless stated otherwise.

ABB challenged Commerce's treatment of U.S. commissions of Hyosung, Hyundai

Heavy Industries Co., Ltd. ("HHI"), and Hyundai Corporation USA ("Hyundai USA,"

collectively with HHI, "Hyundai"), arguing that Commerce improperly added commission

expenses to normal value when it should have deducted them from the constructed

export price, and improperly granted commission offsets to normal value for

commissions on U.S. sales incurred in the United States.  *See* Confidential Pl.'s Mem.

of Law in Supp. of Mot. for J. on the Agency R. at 13-31, ECF No. 41-2.  ABB further

argued that Commerce failed to cap Hyundai's service-related revenue included in the

gross unit price of the LPTs by the amount of the related expenses.  *Id.* at 31-44.

Hyosung challenged Commerce's decision to cap Hyosung's reported inland freight

revenue by Hyosung's reported domestic (i.e., within Korea) inland freight expense.

*See* Confidential Mem. in Supp. of Consol. Pl. Hyosung's Rule 56.2 Mot. for J. Upon the

Agency R. at 11-22, ECF No. 40-2.

The United States ("Defendant" or the "Government") requested a remand to

address the issues that ABB raised; the court granted that request on October 10, 2017.

*See ABB, Inc. v. United States* ("*AR 2 Remand Opinion*"), 41 CIT ___, ___, 273 F.

Supp. 3d 1200, 1205-06 (2017).[3]  The court directed Commerce to reconsider its

treatment of Hyundai's and Hyosung's U.S. commissions and to "evaluate its revenue

capping practice and ensure that its application of this practice is consistent with respect

to [Hyundai and Hyosung]."  *Id.* at 1212.  With respect to the issues Hyosung raised, the

---

[3] *AR 2 Remand Opinion* presents further background information on this case, familiarity with which is presumed.

court sustained Commerce's determination to cap Hyosung's reported freight revenue by its reported domestic inland freight expense.  *Id.*

Commerce filed its Remand Results on February 9, 2018.  *See* Remand Results. Therein, Commerce declined to grant home market commission offsets to Hyundai and Hyosung for U.S. commissions incurred in the United States.  *See id.* at 28-31. Commerce re-examined the record with respect to Hyundai's reporting of the gross U.S. prices for the LPTs and determined that Hyundai had failed to report service-related revenues separate from gross unit price.  *See id.* at 17 & n.56 (citing Draft Results of Redetermination Pursuant to Court Remand (Jan. 9, 2018) ("Draft Remand Results"), CJRA Tab 1, CRR 1, PJA Tab 1, PRR 1, ECF No. 113).  Commerce used facts available with an adverse inference for certain U.S. sales of Hyundai.  Draft Remand Results at 14; Remand Results at 24 (cross-referencing the Draft Remand Results for the agency's methodological use of partial adverse facts available).

Hyundai now challenges Commerce's Remand Results on both issues.  *See* Confidential Def.-Ints.' Comments in Opp'n to the Final Results of Redetermination Pursuant to Court Remand ("Hyundai's Cmts."), ECF No. 106.  Hyosung challenges Commerce's Remand Results with respect to the commission offsets.  *See* Hyosung's Comments on Remand Results ("Hyosung's Cmts."), ECF No. 104.  ABB and the Government urge the court to sustain the Remand Results in their entirety.  *See generally* Confidential Pl.'s Comments in Supp. of Remand ("ABB's Cmts."), ECF No. 108; Def.'s Resp. to Def.-Ints' Comments on the Dep't of Commerce's Final Results of Redetermination ("Gov.'s Cmts."), ECF No. 110.  For the reasons discussed below, the

court sustains the Remand Results with respect to Commerce's treatment of

respondents' U.S. commissions and remands this matter to the agency with respect to

the service-related revenue issue.

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[4] and 28 U.S.C. § 1581(c). The

court will uphold an agency determination that is supported by substantial evidence and

otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a

redetermination pursuant to court remand are also reviewed for compliance with the

court's remand order."  *SolarWorld Ams, Inc. v. United States*, 41 CIT ___, ___, 273 F.

Supp. 3d 1314, 1317 (2017) (internal citation omitted).

DISCUSSION

I.   **U.S. Commission Offsets**

a.  **Commerce's Determination in the Remand Results**

In the Remand Results, Commerce explained that its practice is "to distinguish

two types of commissions paid on U.S. sales: (i) commissions incurred inside the United

States for which Commerce deducts the commission expenses and the related profit

from the price used to establish [constructed export price (or "CEP")[5]], and (ii)

---

[4] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, and all references to the United States Code are to the 2012 edition, unless otherwise stated.
[5] "Constructed export price" is
the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for

commissions incurred outside the United States, for which [Commerce] adds such

commission expenses to normal value[6] and offsets differences in home market

commission expenses and such U.S. commission expenses incurred outside the United

States, if any."  Remand Results at 9-10; *see also id.* at 28.  When a commission

expense is incurred in the United States, Commerce, pursuant to 19 U.S.C.

§ 1677a(d)(1) and (3), makes an adjustment to the price used to establish CEP and for

profit allocated to that commission expense.  *See id.* at 8-9.  In such circumstances,

Commerce treats the commission expense as a CEP expense and "deducts the

expense[] and allocated profit from the price used to establish CEP without providing a

home market commission offset because such commissions are only associated with

economic activities in the United States."  *Id*. at 11.  When a commission expense is

incurred outside the United States (on a sale to the United States), Commerce may

make an upward or downward adjustment to "normal value based on the circumstance

of sale provision in 19 U.S.C. § 1677b(a)(6)(C)(iii) and 19 C.F.R. § 351.410(e)."[7]  *Id*. at

---

the account of the producer or exporter of such merchandise or by a seller
affiliated with the producer or exporter, to a purchaser not affiliated with
the producer or exporter, as adjusted under [19 U.S.C. §§ 1677a(c) and
(d)].

19 U.S.C. § 1677a(b).

[6] "Normal value" typically is "the price at which the foreign like product is first sold . . . for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(B)(i).

[7] 19 C.F.R. § 351.410(e) provides:

The [agency] normally will make a reasonable allowance for other selling
expenses if the [agency] makes a reasonable allowance for commissions
in one of the markets under consideration[], and no commission is paid in
the other market under consideration. The [agency] will limit the amount of

28-29.  Commerce does not treat commissions outside the United States as CEP selling expenses.  *Id.* at 29*; see also id.* at 10.  Instead, the agency "first adds U.S. commissions incurred outside the United States to the normal value of the respective home market sales and then grants home market commission offsets, if applicable, to the normal value of such home market sales."  *Id.* at 10, 29.

Commerce determined that its approach is consistent with the intent of 19 U.S.C. §§ 1677a(d) and 1677b(a)(6)(C)(iii), 19 C.F.R. § 351.402(b),[8] and the Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Doc. No. 103–316, vol.1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040.[9]  *Id.*  Commerce also noted that its practice is consistent with that articulated in the remand redetermination in the first administrative review of the antidumping duty order on LPT's from Korea, which the court sustained in *ABB, Inc. v. United States* ("*AR 1 Opinion*"), 41 CIT ___, 273 F. Supp. 3d 1186 (2017), *appeal filed*, No. 18-1300 (Fed. Cir. Dec. 14, 2017).  *See id.* at 8 & n.27.

---

such allowance to the amount of the other selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

[8] 19 C.F.R. § 351.402(b) provides:
In establishing constructed export price under section [19 U.S.C. § 1677a], the [agency] will make adjustments for expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid. The [agency] will not make an adjustment for any expense that is related solely to the sale to an affiliated importer in the United States, although the [agency] may make an adjustment to normal value for such expenses under section [19 U.S.C. § 1677b(6)(C)(iii)].

[9] The SAA is the authoritative interpretation of the statute.  19 U.S.C. § 3512(d).

Both Hyundai and Hyosung challenge Commerce's determination as contrary to
law.  Hyundai's Cmts. at 15; Hyosung's Cmts. at 1.  Hyosung contends that "nothing in
the statute, regulations, legislative history, or other policy materials" supports a
geographic distinction between commissions incurred in the United States versus those
incurred in the home market on U.S. sales.  Hyosung's Cmts. at 2.  According to
Hyosung, commissions incurred in the United States qualify for a commission offset
pursuant to 19 C.F.R. § 351.410(e), which expressly allows for a commission offset
when commissions are incurred in one market and not the other, without a geographical
distinction as to where the commission expenses must be incurred.  *Id.* at 2-3.[10]
Hyundai argues that Commerce unreasonably treats similar situations differently when it
"den[ies] a commission offset in one circumstance, while granting it in all others."
Hyundai's Cmts. at 15 (citing *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1371
(Fed. Cir. 2011)).  According to Hyundai, there is no indication that Congress intended
for such disparate treatment.  *Id.* at 16.

---

[10] In a single sentence, Hyosung also makes the assertion that "Commerce's Remand
Results are based on an impermissibly vague 'scope of economic activities' test, which
disregards Hyosung's commercial reality and the record facts."  Hyosung's Cmts. at 1
(emphasis removed).  Hyosung did not further develop the argument in its brief, nor did
it elaborate its position during oral argument.  *See* Oral Arg. Tr. at 5:2-22, ECF No. 119.
The court considers Hyosung's failure to articulate any grounds for this assertion as an
implied waiver of this argument.  *See Home Prods. Int'l, Inc. v. United States*, 36 CIT
___, ___, 837 F. Supp. 2d 1294, 1301 (2012) (quoting *United States v. Zannino*, 895
F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner,
unaccompanied by some effort at developed argumentation, are deemed waived. It is
not enough merely to mention a possible argument in the most skeletal way, leaving the
court to do counsel's work, create the ossature for the argument, and put flesh on its
bones.")).

### b.  Commerce's Determination is Sustained

At the outset, neither Hyosung nor Hyundai challenge Commerce's findings that both respondents' U.S. commissions were incurred in the United States.  Therefore, the only issue for the court's consideration is whether Commerce's denial of a commission offset for Hyosung and Hyundai is in accordance with law.

In requesting the remand, the Government acknowledged that Commerce had recently reconsidered its practice with regard to U.S. commissions.  *See AR 2 Remand Opinion*, 273 F. Supp. 3d at 1205.  Commerce articulated that methodology in the remand redetermination in the first administrative review of the antidumping duty order on LPT's from Korea.  *See id.* at 1205 & n.4; *AR 1 Opinion*.  Commerce requested the remand to ensure that the agency's treatment of U.S. commissions in this case was consistent with its methodology.  *AR 2 Remand Opinion*, 273 F. Supp. 3d at 1205.  In the Remand Results, Commerce articulated its treatment of U.S. commissions incurred in the United States on sales to the United States consistently with the methodology expressed in the *AR 1 Opinion*.  *See* Remand Results at 8-11 & n.27, 29-30 & nn.114-115 (citations omitted); *AR 1 Opinion*, 273 F. Supp. 3d at 1192-93 (overview of Commerce's interpretation of the law).

In *AR 1 Opinion*, the court sustained Commerce's treatment of U.S. commissions and the accompanying legal analysis.  *See* 273 F. Supp. 3d at 1193-1200.  The court held that Commerce's methodology was in accordance with law because the statute, regulations, and legislative history supported the geographic distinction Commerce

made when it declined to grant a home market commission offset for U.S. commissions

incurred in the United States.  *Id.*

     As the court explained,

> [w]hile many differences between U.S. price (whether based on export
> price or constructed export price) and normal value are taken into account
> when the price comparison is made, in the case of constructed export
> price transactions, the statutory definition of that price requires certain
> adjustments be made at the outset, in order to determine the constructed
> export price, and without regard to the comparison with normal value.

*Id.* at 1194 (citing 19 U.S.C. § 1677a(b)).  One of those statutory adjustments is a

deduction of "commissions for selling the subject merchandise in the United States."  *Id.*

(quoting 19 U.S.C. § 1677a(d)(1)(A)).  "Although § 1677a(d)(1)(A) does not contain a

geographical distinction on where commissions must be incurred," the implementing

regulation explains that Commerce "will make adjustments for expenses associated with

commercial activities in the United States that relate to the sale to an unaffiliated

purchaser, no matter where or when paid."  *Id.* (quoting 19 C.F.R. § 351.402(b)).[11]

When Commerce adopted 19 C.F.R. § 351.402, it traced its rationale to the SAA,

stating "the SAA makes clear that only those expenses associated with economic

activities in the United States should be deducted from CEP." *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. 27,296, 27,351 (Dep't Commerce May 19, 1997)

---

[11]  Furthermore, as noted, Commerce "will not make an adjustment for any expense that
is related solely to the sale to an affiliated importer in the United States, although [it]
may make an adjustment to normal value for such expenses under [U.S.C.
§ 1677b(6)(C)(iii)]."  19 C.F.R. § 351.402(b); *see also supra* note 8.

(citing SAA at 823, *reprinted in* 1994 U.S.C.C.A.N. at 4164).[12]  Indeed, the relevant

language in the SAA states that Commerce must deduct commissions from the CEP

pursuant to §1677a(d)(1), "but only to the extent that they are incurred in the United

States on sales of the subject merchandise."  SAA at 823, *reprinted in* 1994

U.S.C.C.A.N. at 4164.

Moreover, the SAA explains the differences between the commissions incurred

on U.S. sales in the United States and those incurred on U.S. sales outside the United

States:

> In constructed export price situations Commerce will deduct direct
> expenses incurred in the United States from the starting price in
> calculating the constructed export price. However, direct expenses and
> assumptions of expenses incurred in the foreign country on sales to the
> affiliated importer will form a part of the circumstances of sale adjustment.

SAA at 828, reprinted in 1994 U.S.C.C.A.N. at 4167.  Therefore, "the circumstances of

sale adjustment, including the home market commissions offset," is limited to "direct

expenses and assumptions of expenses *incurred in the foreign country on sales to the*

*affiliated importer* (such as with export price sales)."  *AR 1 Opinion*, 273 F. Supp. 3d at

1196.

Both Hyosung and Hyundai acknowledge that the court has sustained

Commerce's treatment of the commission offset in the first administrative review, but

disagree with the court's decision therein.  *See* Hyosung's Cmts. at 1; Hyundai's Cmts.

---

[12] This statement was made in response to comments that the agency should adjust for all expenses incurred on CEP sales, including those incurred in the foreign market. *Antidumping Duties; Countervailing Dutie*s, 62 Fed. Reg. at 27,351.

at 15.  Neither party, however, provides a compelling argument for why the court should

not follow its decision in *AR 1 Opinion*.  Hyosung's reliance on 19 C.F.R. § 351.410(e) is

misplaced because this regulation addresses the circumstances of sale adjustment to

normal value provided for in 19 U.S.C. § 1677b(a)(6)(C)(iii), which requires the agency

to make adjustments to normal value based on "other differences in the circumstances

of sale."  *See* Hyosung's Cmts. at 1-3; *AR 1 Opinion*, 273 F. Supp. 3d at 1196 (rejecting

the same arguments that Hyosung raises in this review).

        The case to which Hyundai cites, *Dongbu Steel*, concerns Commerce's

inconsistent interpretation of the same statutory provision depending on the segment of

the antidumping proceeding (investigation or review).  635 F.3d at 1371.  The court

concluded that Commence must provide a reasonable explanation for why the statutory

language supports an inconsistent interpretation.  *Id.* at 1373.  The court is not

confronted with the same situation here; Commerce articulated the same rationale for

its treatment of U.S. commissions incurred in the United States as it did in the previous

administrative review.  Therefore, Hyundai's argument is unavailing.

        Because the Remand Results are consistent with the practice that the agency

articulated in the first administrative review, which the court upheld as reasonable and in

accordance with law, Commerce's treatment of U.S. commissions in the Remand

Results will be sustained.

## II.   Service-Related Revenue

### a.  Commerce's Remand Results

In the Remand Results, Commerce stated that it re-examined the record and analyzed whether there was a legal and factual basis for determining whether to cap Hyundai's service-related revenue with the associated expenses.  *See* Remand Results at 2, 5.  After re-examining the record, Commerce found that Hyundai had failed to provide information necessary for Commerce to apply its capping methodology.  *See id.* at 17 & n.56 (citing Draft Remand Results at 11-14).  The information concerned Hyundai's service-related revenues that exceeded the associated expenses.  *Id.* at 17.

Commerce explained that in response to a questionnaire and during verification, the agency had received detailed sales documentation for certain U.S. sales.  As part of the remand proceeding, Commerce re-examined this sales documentation and determined that for many of the transactions, record evidence indicated that the LPT price charged to the final customer included revenues for various services, and those revenues exceeded Hyundai's expenses for the provision of those services.[13]  Remand Results at 23-24; Draft Remand Results at 12.  Consequently, Commerce found Hyundai's gross unit prices for those sales were overstated.[14]  Remand Results at 17 n.56; Draft Remand Results at 13.

---

[13] At verification, Commerce examined five U.S. sales with U.S. sequence numbers ("SEQU") 1, 8, 11, 14, and 27.  Draft Remand Results at 12-13.  Of those sales, Commerce verified U.S. SEQU 1.  *Id.* at 12.

[14] The sales in question are SEQUs 8, 11, 14, and 27.  *Id.* at 12-13.

Commerce also found that "Hyundai failed to cooperate to the best of its ability by not providing the information requested."  Remand Results at 24.  Therefore, Commerce determined that an adverse inference was warranted when selecting among the facts available.  *Id.*  As partial adverse facts available, Commerce reduced the gross unit prices for most U.S. sales "by the highest percent rate difference identified in the [U.S. sales documented at verification]."[15]  Draft Remand Results at 13-14; Remand Results at 24 (cross-referencing the Draft Remand Results for the agency's methodological use of facts available).

### b. Parties' Arguments

Hyundai argues that Commerce's use of partial facts available with an adverse inference was unsupported by substantial evidence and contrary to law.  Hyundai's Cmts. at 2.  Hyundai contends that the agency altered its standard for reporting service-related revenue from one turning on whether "the service was performed to meet the terms of sale" to "whether such service is provided."  *Id.* at 4-5.  Hyundai further takes issue with Commerce's reliance on "mere notations on internal correspondence, rather than documents exchanged with the unaffiliated customer" as evidence of service-related revenue.  *See id.* at 7.  It argues that Hyundai provided complete responses to the agency's requests for information; its responses were reasonable and informed by Commerce's conclusion in the original investigation; and Commerce verified and approved of Hyundai's reporting in the Issues and Decision Memorandum.  *See id.* at 8-

---

[15] Commerce reduced the gross unit prices by [[    ]] percent, which is the percentage amount by which the revenue exceeded the expenses for U.S. SEQU 14.  *Id.* at 14.

12.  Moreover, Hyundai argues that Commerce failed to comply with the statutory requirements of 19 U.S.C. § 1677m(d) because it failed to notify Hyundai of any deficiencies in its reporting or provide it an opportunity to cure those deficiencies.  *See id.* at 12-13.  Additionally, Hyundai contends that Commerce failed to articulate the manner in which Hyundai failed to act to the best of its ability, and failed to explain that Hyundai had the ability to comply or acted in a manner contrary to any reasonable respondent.  *See id.* at 14-15.

The Government contends that the requirement for reporting service-related revenue separately from the gross unit price has remained consistent since the beginning of this proceeding, regardless of the types of documents on which those service-related revenues appear.  *See* Gov.'s Cmts. at 11-12.  The Government further argues that Commerce did not have an obligation to comply with § 1677m(d) because the agency was not aware of the deficiencies in Hyundai's reporting until it discovered the underlying information evincing Hyundai's misreporting for the first time at verification.  *See id.* at 17-18.  According to the Government, despite Commerce's request to separately report service-related revenues, Hyundai "submitted no information, much less deficient information, and stated it had no such information to report."  *Id.* at 17.  Moreover, the Government points out that Hyundai does not dispute that it had access to the information Commerce initially requested and that it failed to provide that information.  *Id.* at 18.  According to the Government, under these circumstances, Commerce's obligations pursuant to 1677m(d) were not triggered.  *Id.* at 19.  Lastly, the Government maintains that the agency adequately articulated how

Hyundai failed to act to the best of its ability, and its decision is supported by substantial evidence.  *Id.* at 19-20.

ABB likewise disputes Hyundai's assertion that Commerce changed the test for reporting service-related revenue.  *See* ABB's Cmts. at 4-5.  According to ABB, to accept Hyundai's claim that the agency improperly relied on internal company documents in assessing the existence of service-related revenue would result in the potential manipulation of the dumping margin.  *Id.* at 10.  It reasons, "if Commerce considered only the service-related revenues reflected in certain sales documents (purchase orders and invoices), rather than *any* sales documentation setting forth the intent of the parties," then "a party could easily manipulate the dumping calculation by listing service-related revenues in a document other than a purchase order or invoice." *Id.*  ABB argues that Commerce was not legally prohibited from applying its capping methodology in the Remand Results after it requested the voluntary remand to reconsider the incorrect approach the agency applied in the *Final Results*.  *See id.* at 6. ABB further contends that the agency's treatment of Hyundai in the Remand Results is consistent with its treatment of Hyosung under similar facts in the *AR 2 Remand Opinion*.  *See id.* at 5-6 & n.4, 7-8 (citing *AR 2 Remand Opinion*, 273 F. Supp. 3d at 1205-06, 2010).  Overall, ABB maintains that the court should affirm Commerce's application of partial AFA.  *See id.* at 11-17.

   **c. Analysis**

      When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce," "fails to provide" requested

information by the submission deadlines, "significantly impedes a proceeding," or

provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i),

Commerce "shall . . . use the facts otherwise available." 19 U.S.C. § 1677e(a).

Additionally, if Commerce determines that the party "has failed to cooperate by not

acting to the best of its ability to comply with a request for information," it "may use an

inference that is adverse to the interests of that party in selecting from among the facts

otherwise available." *Id.* § 1677e(b).  "Compliance with the 'best of its ability' standard is

determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Moreover,

"[a]n adverse inference may not be drawn merely from a failure to respond."  *Id.* at

1383.  Rather, Commerce may apply an adverse inference "under circumstances in

which it is reasonable for Commerce to expect that more forthcoming responses should

have been made." *Id.*

Here, Commerce found that Hyundai "refused to provide the necessary

information for Commerce to apply its capping methodology" and "failed to act to the

best of its ability by not providing the information requested."  Remand Results at 24.

Therefore, the court must consider (1) what information Commerce requested from

Hyundai and whether Hyundai failed to provide that requested information, (2) whether

Commerce informed Hyundai of any deficiencies in its reporting, and (3) whether

Hyundai put forth its maximum effort to provide Commerce with full and complete

answers to Commerce's requests.

> i.   *Commerce's Information Request and Hyundai's Responses
> Thereto*

Substantial evidence supports Commerce's finding that Hyundai did not provide information responsive to the agency's information requests.  In its initial antidumping questionnaire, Commerce instructed Hyundai to report "the sale price, discounts, rebates and all other revenues and expenses in the currencies in which they were earned or incurred."  Initial Antidumping Duty Questionnaire (Dec. 1, 2014) ("Initial AD Questionnaire") at C-20, CRJA Tab 4, PRJA Tab 4, PR 25, ECF No. 113.  Commerce further explained that:

> the gross unit price less price adjustments should equal the net amount of revenue received from the sale. **If the invoice to your customer includes separate charges for other services directly related to the sale, such as a charge for shipping, create a separate field for reporting each additional charge.**

*Id.* at C-18 (emphasis added).

In its initial questionnaire response, Hyundai stated that it reported the gross unit price as the total sales price of the LPT, and reported fields "ADDPOPRU," which included the "sales amount under a separate purchase order for services that were not included in the purchase order for the transformer (e.g., supervision), but that are related to the transformer," and "ADDPOEXPU," which included "the expense associated with the additional services."[16]  Resp. to Secs. B and C Questionnaires (Jan. 26, 2015) ("Sec. B&C Resp.") at C-28, CRJA Tab 5, CR 78-84, PRJA Tab 5, PR 62-64,

---

[16] This explanation did not account for when separate line items for services were included in the same purchase order as the LPT, nor did it address the instructions to report separate charges for services included on the invoice.

ECF No. 113.  Hyundai stated that its reporting methodology was "[c]onsistent with prior

segments of this proceeding[.]"  *Id.* at C-28.

In a supplemental questionnaire, Commerce requested clarification with respect

to those two fields created and reported by Hyundai.[17]  *See* Suppl. Questionnaire for

Secs. B and C of Hyundai Heavy Industries and Hyundai Corp. USA's Resps. to the

Antidumping Duty Questionnaire (May 22, 2015) ("Suppl. Sec. B&C Questionnaire") at

7, CJA Tab 14, CR 171, PJA Tab 14, PR 126, ECF No. 73-2.  In response, Hyundai

explained that it had separately reported only the value of, and expenses for, services

for which "the customer ha[d] issued a separate, additional purchase order for services

related to, but not included in the purchase order for the sale[.]"[18]  Resp. to Suppl. Secs.

B and C Questionnaires (June 3, 2015) ("Suppl. Sec. B&C Resp.") at 15, CRJA Tab 7,

CR 173-178, PRJA Tab 7, PR 132-133, ECF No. 113.  Again, Hyundai cited

Commerce's determination in the original investigation to justify its reporting

methodology.  *Id.* at 14-15.

Despite Commerce's initial instruction that when "the invoice to [the customer]

include[d] separate charges for other services directly related to the sale," Hyundai was

---

[17] Specifically, Commerce asked Hyundai to explain the difference between the two fields: "For example, describe the factual circumstances that would cause different amounts to be reported in these fields for the same sale. In addition, please clarify if you consider a sales amount entered under ADDPOPRU to be part of the purchase price of an LPT, even though the amount appeared on a separate purchase order."  Suppl. Sec. B&C Questionnaire at 7.

[18] In other instances, when the purchase order and invoice included separate line items for services, such as freight, Hyundai included the separately listed revenue in the gross unit price for the LPT and did not separately report it.  Suppl. Sec. B&C Resp. at 14.

to "create a separate field for reporting each additional charge," Initial AD Questionnaire

at C-18, Hyundai failed to do so.  Commerce pointed to record evidence to support its

finding that Hyundai failed to report properly service-related revenues, including multiple

invoices to U.S. customers containing separate line items for services that Hyundai did

not separately report.[19]   *See* Remand Results at 17 n.56; Draft Remand Results 12 &

n.51 (citing Verification Exhibits, SVE 12-15), 13 & n.60 (citations omitted).  Those

invoices were directly responsive to the agency's questionnaire and covered more than

half of the sales for which Commerce received detailed documentation.  *Compare*

*supra,* note 13, *with supra*, note 19.  These invoices constitute substantial evidence that

Hyundai failed to provide Commerce with requested information.

        Nevertheless, there is additional information collected at verification upon which

Commerce seeks to rely.  In particular, Commerce seeks to rely on certain internal

Hyundai communications, absent any evidence of communication with the unaffiliated

customer, to find that there were additional service-related revenues and expenses that

---

[19] Specifically, the invoices provided for three of the five transactions received by
Commerce separately identified service-related charges.  For SEQU 8, the purchase
order and the commercial invoice contained separate line items for ocean freight, inland
freight, and technical field supervision.  Draft Remand Results at 13 n.60 (citing Hyundai
Heavy Industries Sales Verification Exhibits ("Verification Exhibits"), SVE 13 at 13-14
(JA 101136-37), 44-45 (JA 101167-68), CRJA Tab 9, CR 221-225, PRJA Tab 9, ECF
No. 113).  For SEQU 11, the invoice to the U.S. customer contained separate line items
for customs and duties, supervision and delay delivery charges.  Suppl. Sec. A
Questionnaire Resp. (May 13, 2015), Attach. SS-17 at JA 100814-17, CRJA Tab 6, CR
113-130, PRJA Tab 6, PR 104-113, ECF No. 113.  For SEQU 14, the purchase order
and commercial invoice contained separate line-items for customs and duties,
supervision, and delay delivery fees.  *See* SVE 14 at 17 (JA 101282), 25 (JA 101290),
43-45 (JA 101308-10); *see also* Draft Remand Results at 12 & nn.55-56.

Hyundai failed to report.  *See* Remand Results at 22-24.  For one sale, Commerce

stated that although the purchase order between the unaffiliated customer and Hyundai

contained a lump-sum price, the contract between affiliates HHI and Hyundai USA

contained separate service-related revenue figures.[20]  *Id.* at 23 & nn.83-84 (citing

Verification Exhibits, SVE 15 at 20 (JA 101396), 35 (JA 101409)).  For another sale,

Commerce relied on an email exchange among Hyundai employees discussing the

costs for certain services, only some of which were separately identified on the

purchase order and invoice to the U.S. customer.[21]  According to the agency, the fact

that some of the services mentioned in the email were omitted from the purchase order

and the invoice to the unaffiliated customer did "not negate the fact that these are

revenues."  *Id.* at 23-24.

     In its Remand Results, Commerce stated that its capping methodology is not

dependent upon whether a respondent provides the services pursuant to the terms of

sale or whether the service-related expenses and revenues appear as separate line-

items on an invoice to the customer.  *Id.* at 21.  Rather, "[i]f a respondent collects, as a

---

[20] With respect to this sale, SEQU 27, ABB argued at oral argument that the separately listed services in the contract between HHI and Hyundai USA were in response to the customer's request for quote.  Oral Arg. Tr. at 34:13-35:12 (citing Verification Exhibits, SVE 15 at 6 ¶ 4 (JA 101380)).  Commerce did not rely on this rationale or document in the Remand Results.

[21] For SEQU 14, the September 28, 2011, email correspondence discussed costs for ocean freight, inland freight, customs and duties, and supervision, whereas the purchase order and commercial invoice contained separate line-items only for customs and duties, supervision, and delay delivery fees.  *See* Verification Exhibits, SVE 14 at 12 (JA 101277), 17 (JA 101282), 25 (JA 101290), 43-45 (JA 101308-10).  The record does not contain evidence that the costs for ocean freight and inland freight were discussed with the unaffiliated customer.

portion of the final price to the customer, a portion of revenue[,] which is dedicated to

covering a service-related expense, and that service-related expense is less than the

revenue set aside to cover the expense, then this service-related revenue is part of the

material terms of sale and must be capped."  *Id.* at 22; *see also id.* at 21 (stating that the

capping methodology is dependent upon whether "such services were provided and

whether the revenue amounts collected for the provision of such services exceed the

cost of those services.").

        In *AR 2 Remand Opinion*, the court acknowledged that it has examined

Commerce's revenue-capping practice and found it to be reasonable.  *See AR 2

Remand Opinion*, 273 F. Supp. 3d at 1208-09 (citing *Dongguan Sunrise Furniture Co.,

Ltd. v. United State*s, 36 CIT ___, ___, 865 F.Supp.2d 1216, 1248 (2012)).  However,

that acknowledgement came in the context of Hyosung's arguments as to whether

Commerce had applied the incorrect cap and which potential cap "reflected how

Hyosung negotiated freight with its customers."  *Id.* at 1209.  There was no dispute that

the use of the cap was appropriate to reflect service revenues negotiated between

Hyosung and its customers.  That is not the case with respect to certain of Hyundai's

service-related revenues that are only reflected in internal documentation.  Here, the

inquiry is whether Commerce may rely on internal company communications, rather

than documentation or communications shared with the unaffiliated customer, to

determine that there is separate service-related revenue to cap.  The court concludes

that it may not.

In the third administrative review of LPTs from Korea, also under review by this court, Commerce relied on purchase orders and invoices exchanged with the unaffiliated customer to conclude that the separate line items in those documents demonstrated that the services were negotiable.  *Hyundai Heavy Indus., Co. Ltd. v. United States*, Slip Op. 18-101, 2018 WL 4043236, at *5 (CIT Aug. 14, 2018).  As the court stated therein, "[w]hen Commerce finds that a service is separately negotiable, its practice has been to cap the service-related revenue by the associated expenses when determining the U.S. price."  *Id.* at *6.  This is consistent with the position articulated by the agency in the Remand Results here — that it "decline[s] to treat service-related revenue as an addition to U.S. price under [19 U.S.C. §] 1677a(c)(1) . . . or as a price adjustment under 19 [C.F.R. §] 351.102(b)(38)."  Remand Results at 21.

While the agency is correct that 19 U.S.C. § 1677a(c)(1) does not provide for an addition to export price or CEP for service-related profits (when the service-related revenues exceed the service-related expenses), § 1677a(c)(2) likewise does not provide for a reduction to export price or CEP to account for any service-related profit that may inure to the producer or exporter in the course of the transaction.  Thus, the agency has correctly (at times) identified the issue as whether record documentation establishes that the cost of the services (and thus any profit garnered from the provision of those services) was separately negotiable and, therefore, may be excluded from the export price or CEP and whether substantial evidence supports that exclusion.  When substantial evidence does not support a finding that the cost of the services was separately negotiable from the price of the subject merchandise, the agency is without

legal authority to reduce export price or CEP except by the amount of the expense in question.  *See* 19 U.S.C. § 1677a(c)(2)(A).

As noted above, in the case of certain U.S. sales, Commerce relied on Hyundai's internal corporate communications and transactions with its affiliate to apply its capping methodology (and fault Hyundai for failing to report this information, which Commerce deemed "necessary" to apply its capping methodology).  Remand Results at 22-24.  Such internal communications, however, do not provide substantial evidence to support a finding that Hyundai's provision of the services in question was separately negotiable with the unaffiliated customer.  In the absence of such evidence, the Government has not articulated any legal basis for Commerce to reduce Hyundai's gross unit price.[22]

Thus, the court finds that substantial evidence supports Commerce's application of its capping methodology with respect to those transactions for which Commerce identified communications (e.g., purchase orders and invoices) between Hyundai and its unaffiliated customers indicating that the provision of those services may reasonably have been separately negotiable.  Relatedly, substantial evidence supports Commerce's finding that Hyundai failed to provide information necessary for Commerce

---

[22] The court notes that Commerce relied on the data from one of these transactions, SEQU 14, to determine the percentage amount—[[    ]] percent—by which it would reduce the gross unit prices for the other sales in question as an adverse inference. *See* Draft Remand Results at 13 & n.59 (citing Pet'r's Case Br. (Oct. 16, 2015) at 13, n.28, CJA 29, CR 260, PJA 29, PR 185, ECF No. 73-3) (relying, in part, on Verification Exhibits, SVE 14 at 12 (JA 101277) (9/28/2011 email)); *id.* at 14.  Because substantial evidence does not support Commerce's finding that ocean freight and inland freight were separately negotiable for SEQU 14, on remand, Commerce must revisit its selection of the facts available.

to apply its capping methodology with respect to those same transactions.  Substantial evidence does not support Commerce's application of its capping methodology to those transactions or services for which Commerce relied only on internal communications among Hyundai employees or affiliates.[23]

Hyundai's arguments challenging Commerce's findings that are supported by substantial evidence are unavailing.  In particular, Hyundai's claims that it responded to the agency's request based on its reasonable understanding of the request, and that its understanding was informed by Commerce's treatment of service-related revenues in the original investigation, are unpersuasive.  *See* Hyundai's Cmts. at 4, 9-11. Commerce's conclusion in the original investigation was based on the record of that segment of the proceeding.  *See* Issues and Decision Mem., A-580-867 (Jul. 2, 2012) at 29, accompanying *Large Power Transformers from the Republic of Korea*, 77 Fed. Reg. 40,857 (Dep't Commerce July 11, 2012) (final determination of sales at less than fair value) (stating, "based on our review of the record evidence at verification," to wit, "invoices and [purchase orders]," Commerce found "no evidence . . . that Hyundai has separate revenues which it has failed to report").  Each review is separate and based on the record developed by the agency in that review.  *See, e.g., Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2014).   Moreover, the reason for the failure to provide requested information is of no moment.  "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to

---

[23] Specifically, this refers to SEQU 27 and to ocean and inland freight with respect to SEQU 14.

resort to other sources of information to complete the factual record on which it makes

its determination." *Nippon Steel*, 337 F.3d at 1381.  As discussed below, Commerce's

authority to use other sources of information, however—including its authority to use an

adverse inference—is subject to 19 U.S.C. § 1677m(d).  *See* 19 U.S.C. § 1677e(a),(b).

       ii.    *Relevance of 19 U.S.C. § 1677m(d)*

Hyundai argues that Commerce failed to comply with the requirements of 19

U.S.C. § 1677m(d) because Commerce did not timely notify Hyundai of any deficiencies

in its reporting or provide Hyundai an opportunity to cure those deficiencies.  Hyundai's

Cmts. at 12-14.  The Government argues that Commerce did not have an obligation to

comply with § 1677m(d) because the agency was not aware of the deficiencies in

Hyundai's reporting until the underlying information was provided at verification.  *See*

Gov.'s Cmts. at 17 (citing *Branco Peres Citrus, S.A. v. United States*, 25 CIT 1169 n.5,

173 F. Supp. 2d 1363, 1368 n.5 (2001)).  Despite Commerce's request to separately

report service-related revenues, the Government explains that Hyundai "submitted no

information, much less deficient information, and stated it had no such information to

report."  *Id.* at 18.  ABB argues that the provisions of § 1677m(d) only apply when the

requirements of § 1677m(e) have been satisfied and, in this case, the information in

Hyundai's questionnaire responses did not satisfy the conditions of § 1677m(e).  ABB's

Cmts. 14.

Pursuant to § 1677m(d), if Commerce determines that a respondent has not

complied with a request for information, it must promptly inform that respondent of the

nature of the deficiency and, to the extent practicable in light of statutory time-limits for

completion of the administrative review, provide that respondent "an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d).  Inherent in the requirement of § 1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response.  When a respondent provides seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire seeking assurances that the initial response was complete and accurate.  In other words, Commerce is not obligated to issue a supplemental questionnaire to the effect of, "Are you sure?"  That is the case here.

Hyundai provided a seemingly complete response to Commerce's initial questionnaire, and responded to Commerce's supplemental questionnaire stating that it separately reported service-related revenues and expenses consistent with the original investigation.  *See* Sec. B&C Resp. at C-28; Suppl. Sec. B&C Resp. at 14-15.  In the absence of all of Hyundai's documentation, Commerce was not in a position to know that Hyundai's responses were incomplete and inaccurate.  Commerce prepares its questionnaires to elicit information that it deems necessary to conduct a review, and the respondent bears the burden to respond with all of the requested information and create an adequate record.  *See Nan Ya Plastics Corp. Ltd. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016); *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).[24]  It was not until Commerce sorted through Hyundai's sales documentation that

---

[24] "It is Commerce, not the respondent, that determines what information is to be provided for an administrative review."  *Essar Steel Ltd. v. United States*, 34 CIT 1057,

the agency recognized that Hyundai's documentation was inconsistent with its

reporting.[25]  *See* Draft Remand Results at 12-13 & nn.51,60 (citing sales

documentation exchanged with the customer, including invoices, containing separate

line items for services that Hyundai failed to separately report).  Accordingly, under

these circumstances, Commerce was not statutorily mandated to provide Hyundai a

subsequent opportunity to remedy the deficiency.

### iii.  *Use of an adverse inference*

As previously stated, if Commerce determines that the party "has failed to

cooperate by not acting to the best of its ability to comply with a request for information,"

it "may use an inference that is adverse to the interests of that party in selecting from

among the facts otherwise available." 19 U.S.C. § 1677e(b).  Before using adverse facts

available, Commerce must show:

> that a reasonable and responsible importer would have known that the
> requested information was required to be kept and maintained under the

---

1073, 721 F. Supp. 2d 1285, 1299 (2010) (quoting *Ansaldo Componenti, S.p.A. v. United States,* 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986)).  A respondent must respond to the questionnaire as a whole; it may not choose what information to report based on what it thinks is relevant.  *See, e.g., id.* ("Regardless of whether [the respondent] deemed the [] information relevant, it nonetheless should have produced it [in] the event that Commerce reached a different conclusion.").

[25] Hyundai also argues that Commerce was informed prior to verification that Hyundai's gross unit price, as reported, included separate service-related revenue because Hyundai explained in its supplemental questionnaire response that when its terms of sale require a provision of services related to the sale of the LPT, the gross unit price includes the value of the services required.  Oral Arg. Tr. at 47:20-48:9 (quoting Suppl. Sec. B&C Resp. at 14); *see also supra*, note 18.  It also stated that documentation pertaining to SEQU 11 was on the record prior to verification.  Oral Arg. Tr. at 46:25-47:8.  While Hyundai explained its reporting methodology, it did not alert the agency to the existence of the very information—to wit, invoices—that the agency had requested but Hyundai was choosing not to provide in the manner requested by Commerce.

> applicable statutes, rules, and regulations . . . [and] that the respondent['s]
> . . . failure to fully respond is the result of the respondent's lack of
> cooperation in either: (a) failing to keep and maintain all required records,
> or (b) failing to put forth its maximum efforts to investigate and obtain the
> requested information from its records.

*Id.* at 1382-83.  Commerce may apply an adverse inference "under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made."  *Id.* at 1383.  "An adverse inference may not be drawn merely from a failure to respond."  *Id.*

A finding that simply restates the statutory standard and is unsupported by any discussion linking the applicable standard to the particular facts is inadequate.  In its Remand Results, Commerce merely stated that it "finds that Hyundai failed to cooperate to the best of its ability by not providing the information requested."  Remand Results at 24.  Commerce's finding is unsupported by any discussion linking the applicable standard to the particular facts regarding Hyundai.  Such a discussion is particularly relevant to the court's ability to review the agency's determination in a case such as this, when the agency needed the second opportunity of a remand proceeding to reconsider the existing record and alter its determination.  Thus, Commerce's decision to use an adverse inference in selecting among the facts available must be remanded for further consideration and/or explanation.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Remand Results are remanded to Commerce with instructions that the agency may not apply its capping methodology to those

transactions or services for which Commerce relied only on internal communications among Hyundai employees or affiliates (e.g., SEQU 27 and ocean and inland freight services with respect to SEQU 14);

**ORDERED** that Commerce's decision to use an adverse inference in selecting among the facts available is remanded for further consideration or explanation consistent with this opinion;

**ORDERED** that Commerce shall file its remand results on or before February 11, 2019; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 5,000 words; and it is further

**ORDERED** that Commerce's Remand Results in all other respects are sustained.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated:   November 13, 2018
New York, New York