Slip Op. 20-21

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ABB INC.,<br><br>                    Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>        and<br><br>HYUNDAI HEAVY INDUSTRIES CO., LTD.<br>AND HYUNDAI CORPORATION USA,<br><br>                    Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br>Court No. 16-00054<br><br>**Public Version** |

## OPINION AND ORDER

[Remanding the second redetermination upon remand with respect to the application of a circumstance of sale adjustment for delayed delivery charges.]

Dated: February 19, 2020

Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, argued for Plaintiff. With her on the brief was R. Alan Luberda and David C. Smith.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director.  Of counsel on the brief was David W. Richardson, Senior Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>David E. Bond</u> and <u>Ron Kendler</u>, White & Case LLP, of Washington, DC, argued for Defendant-Intervenors Hyundai Heavy Industries, Co., Ltd.[1] and Hyundai Corporation USA.  With them on the brief was <u>William J. Moran</u>.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") second redetermination upon remand.  *See* Confidential Final Results of Redetermination Pursuant to Court Remand (Apr. 26, 2019) ("Second Remand Results"), ECF No. 149; *see generally ABB Inc. v. United States* ("*ABB II*"), 42 CIT ___, 355 F. Supp. 3d 1206 (2018), *recons. denied*, 43 CIT ___, 375 F. Supp. 3d 1348 (2019).  Commerce conducted this second administrative review of the antidumping duty order on large power transformers ("LPT") from the Republic of Korea for the period of review August 1, 2013, to July 31, 2014.  *Large Power Transformers From the Republic of Korea*, 81 Fed. Reg. 14,087 (Dep't Commerce Mar. 16, 2016) (final results of antidumping duty admin. review; 2013–2014) ("*Final Results*"), ECF No. 27-2; and accompanying Issues and Decision Mem., A-580-867 (Mar. 8, 2016), ECF No. 27-2.[2]

---

[1] Hyundai Electric & Energy Systems Co., Ltd. is the successor-in-interest to Hyundai Heavy Industries, Co., Ltd.  *See* Letter from David E. Bond, Attorney, White & Case LLP, to the Court (Sept. 12, 2018), ECF No. 120.

[2] The administrative record filed in connection with the *Final Results* is divided into a public administrative record ("PR"), ECF No. 27-3, and a confidential administrative record ("CR"), ECF No. 27-4.  The administrative record associated with the Second Remand Results is contained in a Public Remand Record ("PR2R"), ECF No. 151-3, and a Confidential Remand Record ("CR2R"), ECF No. 151-2.  Parties submitted joint appendices containing record documents cited in their remand comments.  *See* Second Remand Proceeding J.A., ECF No. 166; Confidential Second Remand Proceeding J.A. ("CJA"), ECF No. 165.  Citations are to the confidential joint appendices unless stated otherwise.

Defendant-Intervenor Hyosung Corporation ("Hyosung")[3] and Plaintiff ABB Inc.

("ABB") filed separate motions for judgment on the agency record challenging certain

aspects of the *Final Results*.  *See* Confidential Rule 56.2 Mot. for J. Upon the Agency R.

of Consol. Pl. Hyosung Corp., ECF No. 40-2; Confidential Pl.'s Mot. for J. on the Agency

R., ECF No. 41; *see generally ABB, Inc. v. United States* ("*ABB I*"), 41 CIT ___, 273 F.

Supp. 3d 1200 (2017).[4]  In response, the Government requested a remand for

Commerce to address issues raised by ABB—that is, to reconsider its treatment of

certain U.S. commission expenses incurred by Hyosung and Defendant-Intervenors

Hyundai Heavy Industries Co., Ltd ("HHI"), and Hyundai Corporation USA ("Hyundai

USA") (together, "Hyundai") and Hyundai's sales-related revenue.  *See* Def.'s Resp. to

Pls.' Rule 56.2 Mots. For J. Upon the Agency R., ECF No. 50; *ABB I*, 273 F. Supp. 3d at

1205.

In *ABB I*, the court granted the Government's request for remand and rejected

Hyosung's arguments.  273 F. Supp. 3d at 1205–06, 1208–12.  Commerce filed the first

remand results on February 9, 2018.  *See* Confidential Final Results of Redetermination

Pursuant to Court Remand (Feb. 9, 2018) ("First Remand Results"), ECF No. 96.

Therein, Commerce determined that Hyundai received revenue for services provided to

unaffiliated U.S. customers that exceeded the related expense of providing those

---

[3] On August 29, 2019, the court granted Hyosung's motion for partial final judgment and to amend the statutory injunction, thereby granting final judgment with respect to all of Hyosung's counts and Count I of ABB's Complaint as it relates to Hyosung.  *See* Order (Aug. 29, 2019), ECF No. 169.

[4] The court's opinions in *ABB I* and *ABB II* present background information on this case, familiarity with which is presumed.

services.  *Id.* at 6–8, 23.  As a result, Commerce found that Hyundai's gross unit prices

for those sales with service-related revenue were overstated.  *Id.* at 20–24 (explaining

Commerce's rationale for capping service-related revenue).  Thus, for those sales,

Commerce capped the service-related revenue by the amount of the service-related

expense ("the capping methodology"), thereby lowering the U.S. price used in the

dumping margin calculation.[5]  *Id.* at 6–8, 19–25.  Commerce also concluded that

"Hyundai failed to cooperate to the best of its ability" in reporting its service-related

revenue and applied partial facts available with an adverse inference (or "partial AFA")

in connection with service-related revenues.  First Remand Results at 24.

On November 13, 2018, the court remanded the First Remand Results.  *ABB II*,

355 F. Supp. at 1223.  Relevant to this discussion, the court determined that

Commerce's application of the capping methodology "to those transactions or services

for which Commerce relied only on internal communications among Hyundai employees

or affiliates" was not supported by substantial evidence.  *Id.* at 1221.  The court found

that the internal company communications did not, by themselves, serve as substantial

evidence that the relevant services were separately negotiable[6] with the unaffiliated

---

[5] In the First Remand Results, Commerce also revisited its methodology for making
home market commission offsets for U.S. commissions incurred in the United States,
which the court sustained.  *See ABB II*, 355 F. Supp. 3d at 1211–15.

[6] Commerce has been concerned with the possibility that export price ("EP") or
constructed export price ("CEP") is overstated when Hyundai receives revenue for a
service that exceeds its cost of providing that service.  *See, e.g.*, Second Remand
Results at 16–18; First Remand Results at 20–24.  As the court explained in *ABB II*, 19
U.S.C. § 1677a(c)(1) and (2) do not provide for an upward or downward adjustment to
EP or CEP solely because the nominal revenue associated with the provision of a

customers.  *Id.* at 1220.  While the court sustained Commerce's use of facts available, the court also remanded Commerce's use of an adverse inference for further explanation or reconsideration.[7]  *Id.* at 1223.

On April 26, 2019, Commerce filed the Second Remand Results.  For certain services provided for two transactions, identified as U.S. sales sequence numbers ("SEQU") 14 and 27, Commerce determined that the record did not support a finding that the services were separately negotiable with the unaffiliated customer and, therefore, did not cap the revenue based on the service-related expense.  Second Remand Results at 17–18, 20–22.  Commerce also did not apply its capping methodology to the delayed delivery charges associated with two transactions, SEQUs 11 and 14, instead making circumstance of sale adjustments to normal value for those charges.[8]  *Id.* at 17–18; Draft Results of Redetermination Pursuant to Court Remand (Apr. 3, 2019) at 17, PR2R 5, CR2R 11, CJA Tab 10.  Commerce confirmed, however,

---

service exceeds the expense of providing that service.  355 F. Supp. 3d at 1220.  As explained therein, when the record evidence does not support a finding that the cost of the service was separately negotiable from the price of the subject merchandise, Commerce is without legal authority to adjust EP or CEP except by the amount of the expense in question.  *Id.* (citing 19 U.S.C. § 1677a(c)(2)(A)).

[7] Hyundai also filed a motion for reconsideration, Confidential Def.-Ints.' Mot. for Recons., ECF No. 133, which the court denied, *see ABB Inc. v. United States*, 43 CIT ___, 375 F. Supp. 3d 1348 (2019).

[8] After Commerce issued the Second Remand Results, Hyundai filed ministerial comments alleging that Commerce's use of the circumstance of sale adjustments for delayed delivery charges is a ministerial error.  Min. Cmts. on the Dep't's Final Results of Redetermination Pursuant to Court Remand (May 3, 2019), CJA Tab 15.  The parties included the Ministerial Error Comments in the Joint Appendix for the Second Remand Results, but it is not part of the administrative record for the remand determination and Commerce has not otherwise addressed the ministerial error allegation.

that in the case of three transactions for which it had documentation, Hyundai received

service-related revenues for separately negotiable services that exceeded the

associated expenses.  Second Remand Results at 16–17.  Commerce provided

additional explanation of its decision to apply partial AFA, concluding that an adverse

inference was warranted "[b]ecause Hyundai had the service-related revenue

information and failed to provide it as requested by Commerce."  *Id*. at 15.  Thus,

Commerce found "Hyundai failed to cooperate to the best of its ability with regard to the

reporting of service-related revenue."  *Id*.

Hyundai argues that the Second Remand Results should again be remanded to

the agency for two reasons: (1) Commerce's use of the circumstance of sale adjustment

for the delayed delivery charges is not in accordance with law or supported by

substantial evidence; and (2) Commerce's use of an adverse inference in its selection of

facts available was not in accordance with law or supported by substantial evidence

because Hyundai complied with Commerce's requests to the best of its ability.

Confidential Def.-Ints.' Cmts. in Opp'n to the Final Results of Redetermination Pursuant

to Court Remand ("Hyundai's Opp'n Cmts."), ECF No. 154.

ABB separately challenges Commerce's Second Remand Results, arguing that

(1) Commerce should have found all services associated with SEQUs 14 and 27 to

have been separately negotiable with the unaffiliated customer such that the service-

related revenue capping methodology applied; and (2) Commerce should have treated

the delayed delivery charges as service-related revenues and applied the capping

methodology.  Confidential Pl.'s Cmts. in Opp'n to Second Remand Results ("ABB's

Opp'n Cmts."), ECF No. 156.

    The Government filed a response to both Hyundai and ABB arguing that the

Second Remand Results are supported by substantial evidence and in accordance with

law.  Confidential Def.'s Resp. to Cmts. on Second Remand Results ("Gov't Resp."),

ECF No. 160.  Additionally, ABB filed comments in support of Commerce's use of an

adverse inference, Pl.'s Cmts. in Supp. of Second Remand Results ("ABB's Supp.

Cmts."), ECF No. 161, and Hyundai filed comments asserting that, except for the use of

circumstance of sale adjustments for delayed delivery charges, Commerce's application

of the capping methodology with respect to the five transactions for which it did not draw

an adverse inference was consistent with the court's guidance, Def.-Ints.' Cmts. in

Supp. of the Final Results of Redetermination Pursuant to Court Remand ("Hyundai's

Supp. Cmts."), ECF No. 162.

    For the reasons discussed below, the court remands the Second Remand

Results for Commerce to reconsider its circumstance of sale adjustments for the

delayed delivery charges.  The Second Remand Results are sustained in all other

respects.

## JURISDICTION

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[9] and 28 U.S.C. § 1581(c). The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order."  *SolarWorld Ams, Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (internal citation omitted).

## DISCUSSION

### I.   Service-Related Revenue

#### A.  Legal Authority

"When Commerce finds that a service is separately negotiable, its practice has been to cap the service-related revenue by the associated expenses when determining the U.S. price."  *Hyundai Heavy Indus., Co. v. United States*, 42 CIT ___, ___, 332 F. Supp. 3d 1331, 1340 (2018); *see also ABB II*, 355 F. Supp. 3d at 1219–20.  The court has recognized this practice as a reasonable exercise of Commerce's discretion in

---

[9] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are generally to the 2012 edition. However, the Trade Preferences Extension Act ("TPEA"), Pub. L. No. 114–27, § 502, 129 Stat. 362, 383–84 (2015), made several amendments to the antidumping and countervailing duty laws. Section 502 of the TPEA amended 19 U.S.C. § 1677e.  *See* TPEA § 502. The TPEA amendments affect all antidumping duty determinations made on or after August 6, 2015.  *See* Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015, 80 Fed. Reg. 46,793 (Dep't Commerce Aug. 6, 2015).  Accordingly, all references to 19 U.S.C. § 1677e are to the amended version of the statute.

determining the price of the subject merchandise.  *See ABB II*, 355 F. Supp. 3d at

1219–20; *Hyundai*, 322 F. Supp. 3d at 1340; *ABB I*, 273 F. Supp. 3d at 1208–09.

### B.  Background

In the First Remand Results, Commerce capped service-related revenue for

certain services associated with SEQUs 14 and 27. First Remand Results at 17 n.56.

For these two transactions, Commerce identified the services at issue based on certain

Hyundai internal corporate communications.  *Id.* at 22–24.  The court remanded this

determination, explaining that "[s]uch internal communications . . . do not provide

substantial evidence to support a finding that Hyundai's provision of the services in

question was separately negotiable with the unaffiliated customer."  *ABB II*, 355 F.

Supp. 3d at 1220.

In the Second Remand Results, Commerce determined that the internal

communications did not demonstrate that the services were separately negotiable with

respect to SEQUs 14[10] and 27[11].  *See* Second Remand Results at 17–18.  After

disregarding these communications, Commerce found that the record otherwise lacked

evidence that the services at issue were separately negotiable and the agency did not

---

[10] With respect to SEQU 14, an HHI employee requested by email that HHI's affiliated U.S. sales agent submit a price quote to a customer and, in that internal email, identified the costs associated with ocean freight and inland freight, which were included in the total price.  Verification Exhibit SVE-14 (Pre-Selected Sample Sales-U.S. SEQU 14 (Verification Agenda VI) (July 31, 2015)) at 12, CR2R 221–225, CJA Tab 5 (Email dated September 2011 ("the SEQU 14 Email")).

[11] The internal communication at issue for SEQU 27 is the contract between HHI and Hyundai USA ("the SEQU 27 Contract") that itemizes services associated with the sale. Verification Exhibit SVE-15 (Surprise Sample Sales-U.S. SEQU 27 (Verification Agenda VI) (July 31, 2015)) at 20, CR2R 221–225, CJA Tab 6.

apply the capping methodology to them.  *See id.* at 20–22; *see also* Analysis of Data

Submitted by Hyundai Heavy Indus. (HHI) in the Final Results of Second Remand of the

Antidumping Duty Admin. Review of Large Power Transformers from the Republic of

Korea; 2013–2014 (Apr. 26, 2019) ("Final Analysis Mem.") at 2–3, PR2R 11, CR2R 15,

CJA Tab 14.

### C. Parties' Arguments

ABB contends that Commerce's decision not to treat the adjustments for SEQUs

14 and 27 as service-related revenue subject to capping is not supported by substantial

evidence because the agency "misunderstood or misapplied the [c]ourt's instruction" in

*ABB II*.  ABB's Opp'n Cmts. at 2; *see also id.* at 9–10.  ABB asserts that the

communications at issue are indicative of communication with the unaffiliated customers

regarding the services.  *See id.* at 2–8.

The Government argues that the "evidentiary standard set forth in" *ABB II*

requires "not just evidence of communication but evidence that the *services at issue*

were 'separately negotiable.'"[12]  Gov't Resp. at 4 (quoting *ABB II*, 355 F. Supp. 3d at

1220).  The Government asserts that Commerce appropriately found that the

communications did not establish that the services were separately negotiable with the

unaffiliated customers, and ABB's arguments to the contrary are based on speculation.

*See id.* at 5–8.

---

[12] Hyundai supports Commerce's finding that the adjustments in question do not
constitute service-related revenue subject to the capping methodology.  Hyundai's
Supp. Cmts.

### D.  Substantial Evidence Supports Commerce's Finding

ABB argues that Commerce's conclusion that certain services for SEQUs 14 and 27 were not separately negotiable is not supported by substantial evidence and Commerce "misunderstood or misapplied" the court's remand instructions because, in ABB's view, the record contains evidence of communication with the unaffiliated customers.  ABB's Opp'n Cmts. at 2, 10.  The court does not find ABB's arguments persuasive.

In *ABB II*, the court found that substantial evidence did not support Commerce's "application of its capping methodology to [SEQUs 14 and 27] for which Commerce relied only on internal communications among Hyundai employees or affiliates."  355 F. Supp. 3d at 1221 & n.23.  Here, Commerce found that the services in question for SEQU 14 were not separately negotiable because the court "specifically ruled" that the SEQU 14 Email "does not contain evidence that the costs for ocean freight and inland freight were discussed with the unaffiliated customer."  Second Remand Results at 20 & n. 75 (quoting *ABB II*, 355 F. Supp. at 1219 n.21).  Commerce also found that the SEQU 27 Contract, a contract between HHI and Hyundai USA, did not indicate that the unaffiliated customer negotiated "items with Hyundai separately from the transformer price."  *Id.* at 21.  While ABB argues that HHI and Hyundai USA entered into the SEQU 27 Contract because of a request for a price quote issued by the unaffiliated customer to HHI, s*ee* ABB's Opp'n Cmts. at 8, Commerce explained that HHI's offer to the unaffiliated customer in response to the request does not indicate that the services were separately negotiable by the unaffiliated customer, Second Remand Results at 21 &

n.83.  Additionally, the purchase order and invoice for SEQU 27 did "not show separate line items for services other than a lump-sum price."  *Id.* at 21.  Thus, Commerce concluded that these communications did not provide "a basis for the service-related revenue capping" for SEQUs 14 and 27.  *Id.* at 20.

Moreover, the Second Remand Results indicate that Commerce carefully considered ABB's arguments that the communications at issue could serve as a basis for finding that the services were separately negotiable by the customer.  *See id.* at 19–22.  The agency reviewed the record and expressly found that "none of the internal documents cited by ABB indicate the service-related revenue amounts were separately negotiated with the customer" after agreeing with ABB that "*if* Hyundai's internal documentation had demonstrated that specific amounts of service-related revenue were separately negotiated with the customer, Commerce *could* rely on such information as the basis for . . . capping."  *Id.* at 20 (emphasis added).  Commerce parsed various services associated with the transactions—declining to cap some and capping others when the evidence supported doing so.  *See id.* at 20–22.  ABB does not identify evidence Commerce did not consider; rather ABB merely disagrees with Commerce's conclusions.  However, even the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's determination from being supported by substantial evidence.  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006).  Thus, the court finds no error in the agency's reasoning or its review of record evidence in applying the capping methodology.

## II.   Circumstance of Sale Adjustment

### A.  Legal Framework

Among other price adjustments, Commerce adjusts normal value for differences

between normal value and U.S. price that are not otherwise provided for in the statute

and are due to "other differences in the circumstances of sale."  19 U.S.C.

§ 1677b(a)(6)(C)(iii).  With one exception, which is not relevant here, Commerce's

regulations limit circumstance of sale adjustments to "direct selling expenses and

assumed expenses."  19 C.F.R. § 351.410(b).  Direct selling expenses are defined as

"expenses, such as commissions, credit expenses, guarantees, and warranties, that

result from, and bear a direct relationship to, the particular sale in question."  *Id.*

§ 351.410(c).  Assumed expenses are defined as "selling expenses that are assumed

by the seller on behalf of the buyer, such as advertising expenses."  *Id.* § 351.410(d).

### B.  Commerce's Decision

Commerce found that Hyundai's commercial invoices for SEQUs 11 and 14

indicate that Hyundai received revenue for delaying delivery and this revenue exceeded

the expense it incurred for delaying the delivery; however, Commerce also found that

this charge was not service related.[13]  *See* Second Remand Results at 16–18.  Because

---

[13] As Hyundai explained, the delayed delivery charges were not inventory carrying costs
or warehousing fees.  *See* Cmts. on the Dep't's Draft Results of Redetermination
Pursuant to Court Remand (Apr. 12, 2019) at 8, PR2R 9, CR2R 13, CJA Tab 12.
"Hyundai does not produce LPTs for inventory or keep them in inventory;" rather it ships
LPTs "immediately upon completion, testing, and disassembly of the LPT."  *Id.*
"Hyundai received the change orders for the delayed delivery charges during the
construction process," and "the additional charge was for costs at the factory."  *Id.* at 8–
9.

"Hyundai charged its customers due to the customer's specific request to delay the

delivery of subject merchandise in the context of its sale," Commerce found that the

delayed delivery represents a change in the circumstance of the sales, which warranted

a circumstance of sale adjustment.  *Id.* at 22; *see also* Final Analysis Mem. at 3.

Accordingly, Commerce increased normal value by the amount of the delayed delivery

charge collected on the U.S. sales.  Final Analysis Mem. at 3.

### C.  Parties' Arguments

ABB argues that the delayed delivery charges are revenues, not expenses, and

thus, the agency's use of circumstance of sale adjustments for delayed delivery charges

is not in accordance with statutory and regulatory authority.  ABB's Opp'n Cmts. at 12.

ABB asserts that Commerce should have treated the delayed delivery charges as

service-related revenue.  *Id.* at 13–14.  Hyundai also argues that the delayed delivery

charges are revenues, Hyundai's Opp'n Cmts. at 3–4, and requests that the court

remand with instructions to remove the circumstance of sale adjustments for delayed

delivery charges, *id.* at 6.

The Government argues that the regulations do not limit Commerce to making

circumstance of sale adjustments only for "booked expenses."  Gov't Resp. at 9.

According to the Government, "the regulatory term 'In general,' [] means that Commerce

will 'generally'" but not exclusively, make circumstance of sale adjustments for "selling

expenses and assumed selling expenses."  *Id.* at 9 (quoting 19 C.F.R. § 351.410(b)).

### D. Commerce's Circumstance of Sale Adjustment is Not in Accordance with Law

Commerce's use of circumstance of sale adjustments for delayed delivery charges is not in accordance with law.  As noted above and relevant here, Commerce's regulations limit circumstance of sale adjustments to "direct selling expenses and assumed expenses."  19 C.F.R. § 351.410(b).  "A 'direct selling expense' must be (1) an 'expense[]' that (2) 'result[s] from, and bear[s] a direct relationship to, the particular sale in question.'"  *Habaş Sinai Ve Tibbi Gazlar Istihsal Endüstrisi, A.Ş. v. United States*, Slip Op. 19-130, 2019 WL 5270152, at *10 (CIT Oct. 17, 2019) (alterations in original) (quoting 19 C.F.R. § 351.410(c)).  Commerce's regulation provides examples of "direct selling expenses," all of which involve an "an actual or imputed *expenditure* by the respondent."  *Id.* (emphasis added) (citing 19 C.F.R. § 351.410(c)).

Here, Commerce found that the delayed delivery charge was not an expenditure but, instead, yielded revenue.  *See* Second Remand Results at 16–18, 22.  Thus, Commerce's use of a circumstance of sale adjustment for the delayed delivery charge is not in accordance with Commerce's regulations.  *See Habaş*, 2019 WL 5270152, at *9–10 (explaining that Commerce's determination to make a circumstance of sale adjustment where the respondent did not incur any expense was owed no deference in accordance with *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)).

The Government's argument that Commerce appropriately interpreted the regulatory term "in general" lacks merit.  *See* Gov't's Resp. at 9–10.  As the court has explained:

> [T]he phrase "In general" is the heading to subsection (b), not part of the text. Rather than speaking to the scope of the permissible adjustments, it speaks to the scope of the regulation, which, with the exception of certain commissions, permits adjustments "only for direct selling expenses and assumed expenses." [19 C.F.R. § 351.410(b)]. It is a well-settled interpretive rule that "the heading of a section . . . cannot undo or limit that which the text makes plain." *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947) (construing a statute); *see also Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1316 (Fed. Cir. 2017) (principles of statutory interpretation apply likewise to regulations).

*Habaş*, 2019 WL 5270152, at *10 n.13. Here, as in *Habaş*, the Government "seeks to negate the explicit limitation the word 'only' places on the types of permissible adjustments, and is, therefore, misleading and erroneous." *Id*. Because Commerce's use of circumstance of sale adjustments for delayed delivery charges is not in accordance with law, the court remands this issue for reconsideration.[14]

## III.   Adverse Inference

### A.  Legal Framework

When "necessary information is not available on the record," or an interested party "withholds information" requested by Commerce," "fails to provide" requested information by the submission deadlines, "significantly impedes a proceeding," or provides information that cannot be verified pursuant to 19 U.S.C. § 1677m(i), Commerce "shall . . . use the facts otherwise available." *Id.* § 1677e(a). If Commerce determines that the party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," Commerce "may use an inference that is

---

[14] ABB argues that Commerce should have treated the delayed delivery charges as service-related revenue subject to the capping methodology. ABB's Opp'n Cmts. at 10–14. Commerce found that this fee was not service-related and has not otherwise found that it was separately negotiable.

adverse to the interests of that party in selecting from among the facts otherwise

available." *Id.* § 1677e(b).  "Compliance with the 'best of its ability' standard is

determined by assessing whether a respondent has put forth its maximum effort to

provide Commerce with full and complete answers to all inquiries in an investigation."

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

### B.  Background and Commerce's Decision[15]

In the initial antidumping questionnaire, Commerce asked Hyundai to "[r]eport the

sale price, discounts, rebates and all other revenues" associated with the subject

merchandise and to report separately "each type of billing adjustment."  Request for

Information (Dec. 1, 2014) ("Initial Questionnaire") at C-20, PR2R 25, CJA Tab 1.  While

Hyundai reported certain "services and related expenses in connection with various

U.S. sales," it "did not report separate revenue for these expenses."  Second Remand

Results at 12–13.

Commerce issued a supplemental questionnaire seeking clarification of

Hyundai's reporting methodology with respect to service-related revenues and

expenses.  *Id.* at 13.  Hyundai responded that, "[i]n accordance with Commerce's

decision in the Original Investigation, whe[n] the customer has issued a separate,

additional purchase order for services related to, but not included in the purchase order

for the sale, Hyundai has reported the value of the additional purchase order and

related expenses separately."  *Id.* at 13 & n.43 (quoting Resp. to Suppl. Secs. B and C

---

[15] For additional background regarding Commerce's determination to apply partial AFA, see *ABB II*, 355 F. Supp. 3d at 1215–23.

Questionnaires (June 3, 2015) at 15, CR2R 173–178, PR2R 132–133, CJA Tab 4).

During verification, Commerce examined documentation for several sales and found

invoices breaking out service-related revenues that had not been reported separately as

Commerce had instructed.[16]  *See* Second Remand Results at 14 & nn.47–49.

In the First Remand Results, Commerce applied partial AFA because it

determined that Hyundai's failure to report separately these service-related revenues

constituted a failure to act to the best of its ability "to provide [] necessary information for

Commerce to apply its capping methodology."  First Remand Results at 24.  The court

sustained Commerce's decision to resort to facts available but remanded Commerce's

decision to apply an adverse inference because Commerce "simply restate[d] the

statutory standard" without the support of "any discussion linking the applicable

standard to the particular facts."  *ABB II*, 355 F. Supp. 3d at 1223.

In the Second Remand Results, Commerce continued to apply partial AFA based

on Hyundai's failure to report its service-related revenues.[17]  Second Remand Results

at 15.  In so doing, Commerce explained that Hyundai failed to report separately these

---

[16] These separately identified revenues "exceeded Hyundai's expenses for the provision
of those services," and Commerce later concluded that, as a result, the "gross unit
prices for those sales were overstated."  *ABB II*, 355 F. Supp. 3d at 1215 (citations
omitted).

[17] For the transactions for which Commerce had actual revenue and expense
information, the agency capped the service-related revenue by the service-related
expense.  *See* Second Remand Results at 10.  For all other sales, the record contains
no service-related revenue information and Commerce applied partial AFA.  *Id.* at 15.
As partial AFA, Commerce "used the highest percentage difference between service-
related revenue and the service-related expenses from the SEQUs with usable service-
related expenses."  *Id.*

revenues despite the agency's multiple requests and record evidence demonstrating that Hyundai had the ability to do so.  *Id.* at 12–14; *see also id.* at 27–29.  Thus, Commerce concluded that Hyundai had not complied with Commerce's information requests to the best of its ability.  *Id.* at 15.

### C.  Parties' Arguments

Hyundai argues that Commerce "could not have reasonably expected Hyundai to be more 'forthcoming'" because its reporting methodology is consistent with the methodology Commerce accepted in the initial investigation.  Hyundai's Opp'n Cmts. at 7.  Hyundai argues that any use of facts available should have been neutral with respect to service-related revenues.  *Id.* at 9–10.

The Government responds that Commerce is not obligated to modify its reporting expectation in this segment of the proceeding based on its treatment of Hyundai's response in prior segments.  *See* Gov't's Resp. at 12–13; *see also* ABB's Supp. Cmts. at 4–5.  The Government avers that if a respondent typically maintains the data requested by Commerce but fails to report it, such failure "after a deficiency notice by Commerce or a discovery of the failure to properly report data at verification, constitutes a failure of the respondent to act to the best of its ability."  Gov't's Resp. at 12; *see also* ABB's Supp. Cmts. at 3–4.

### D.  Commerce's Determination to Use an Adverse Inference is Supported by Substantial Evidence and in Accordance with Law

Substantial evidence supports Commerce's application of partial AFA.  Hyundai did not accurately report service-related revenue as requested in the Initial Questionnaire.  *See* Second Remand Results at 12.  Commerce then sought

clarification regarding Hyundai's reporting methodology, and Hyundai responded that its

reporting "was based on its experience in the original investigation" but did not "alert[]

Commerce to the existence of service-related revenue which appears in its invoices to

certain unaffiliated customers." *Id.* at 15.   Information collected at verification

demonstrates that Hyundai had the ability to break out service-related revenue. *Id.* at

14.  That information also indicates that, except as modified in the Second Remand

Results, Commerce reasonably concluded that the services were separately negotiable.

*Id.*  Absent this information, "Commerce was not in a position to know that Hyundai's

responses were incomplete or inaccurate." *ABB II*, 355 F. Supp. 3d at 1222.

Under these circumstances, Hyundai's "behavior cannot be considered maximum

effort to provide Commerce with full and complete answers." *Maverick Tube Corp. v.

United States*, 857 F.3d 1353, 1361 (Fed. Cir. 2017) (citation and internal quotation

marks omitted).  Thus, the court finds that substantial evidence supports Commerce's

determination that Hyundai failed to make "maximum and best efforts" to comply with its

information requests.  Second Remand Results at 28.

Moreover, the court is not persuaded by Hyundai's argument that Commerce

could not have expected the company to be more forthcoming.  Each administrative

review is a separate exercise of Commerce's authority and allows for different

conclusions based on different facts in the record. *Jiaxing Brother Fastener Co. v.

United States*, 822 F.3d 1289, 1299 (Fed. Cir. 2014).  Commerce's findings with respect

to Hyundai's reporting methodology in prior segments of this proceeding do not relieve

Hyundai of its burden to comply with Commerce's requests in this segment. *See*

*Mukand, Ltd. v. United States*, 767 F.3d 1300, 1306 (Fed. Cir. 2014) ("To avoid the risk of an adverse inference, respondents must take reasonable steps to maintain full and complete records and put forth maximum effort to investigate and obtain all requested information."); *Hyundai Heavy Indus.*, 332 F. Supp. 3d at 1342 ("HHI may not, however, rely on Commerce's factual conclusions from prior reviews in the instant review because each review is separate and based on the record developed before the agency in the review.").  For these reasons, the court sustains Commerce's application of partial AFA with respect to Hyundai's reporting of service-related revenue.

CONCLUSION AND ORDER

For the reasons discussed herein, it is hereby:

**ORDERED** that Commerce's Second Remand Results are remanded in part and sustained in part; and it is further

**ORDERED** that, on remand, Commerce shall recalculate normal value without making circumstance of sale adjustments related to the delayed delivery charges, consistent with this opinion; and it is further

**ORDERED** that Commerce's Second Remand Results are sustained in all other respects; and it is further

**ORDERED** that Commerce shall file its remand redetermination on or before May 19, 2020; and it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule 56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 3,000

words.

/s/     Mark A. Barnett    
Mark A. Barnett, Judge

Dated: February 19, 2020
      New York, New York